OFFICE OF ENVIRONMENTAL ADJUDICATION; Killbuck Concerned Citizens Association and Anderson Community School Corporation, Appellants,

v.

J.M. CORPORATION, Appellee.

J.M. CORPORATION and Office of Environmental Adjudication, Appellants,

v.

ANDERSON COMMUNITY SCHOOL CORPORATION; Killbuck Concerned Citizens Association and Commissioner, Indiana Department of Environmental Management, Appellees.

No. 49A02–9509–CV–525.

Court of Appeals of Indiana.

Dec. 31, 1997.

Transfer Denied June 11, 1998.

---

Robert R. Clark, Scott R. Alexander, Sommer & Barnard, P.C., Indianapolis, for Anderson Community School Corporation and Killbuck Concerned Citizens Association, Inc.

Jeffrey A. Modisett, Attorney General, Jon Laramore, Rachel Zaffrann, Rafal Ofierski, Deputy Attorneys General, Indianapolis, for Office of Environmental Adjudication and Indiana Department of Environmental Management.

Peter J. Rusthoven, John M. Kyle, III, E. Sean Griggs, Barnes & Thornburg, Indianapolis, for J.M. Corporation.

## OPINION

SULLIVAN, Judge.

Appellants, The Office of Environmental Adjudication (OEA), Killbuck Concerned Citizens Association and Anderson Community School Corporation (collectively, Intervenors), appeal the trial court's June 22, 1995 order granting summary judgment in favor of appellee, J.M. Corporation (J.M.). That order, entered by Special Judge James Coachys, vacated the May 31, 1994 final order of the Solid Waste Management Board (the predecessor to the OEA [1]), which denied J.M. an operating permit for a sanitary landfill. Judge Coachys remanded the cause to the OEA in order to complete all administrative action within sixty days. The first appeal was timely made to this court.

Meanwhile, however, the Board, upon remand from the trial court, completed all administrative action and approved J.M.'s permit application. That determination was appealed by the Intervenors, and the trial court, by Special Judge Ronald Gottschalk, granted the Intervenors' motion for summary judgment, vacated the OEA determination and again remanded the cause to the OEA. It is from this trial court order that the second appeal, brought by J.M., was taken and consolidated with the aforementioned action. We will address the appeals in this order [2].

The path of the litigation, and the facts surrounding it, are long and complicated. However, insofar as the trial courts were reviewing determinations made by an administrative agency, we note that the reviewing courts, here the Marion County Superior Court and the Madison County Superior Court, are "bound by the findings of fact made by the agency if those findings are supported by substantial evidence." *Hamilton County Dept. of Pub. Welfare v. Smith* (1991) Ind.App., 567 N.E.2d 165, 168. In the present action, both appeals involve reviewing courts which, contrary to law, entered their own findings of fact. As we pointed out in *Moore v. Indiana Family and Social Serv. Admin.* (1997) Ind.App., 682 N.E.2d 545, the review court "simply does not have the power to enter findings of fact, and as such, its findings shall be ignored." *Id.* at 547.

### I. THE FIRST APPEAL

We therefore turn our attention to the April 14, 1994 findings of the Board from whence we glean the facts of this case.[3] In April of 1981, J.M. submitted an application for a construction permit to build a landfill at the Mallard Lake site. A second application was submitted in November of 1982 seeking

---

1. The OEA now handles all adjudicatory functions which were once within the ambit of the Solid Waste Management Board.

2. We note at the outset the complexity of this appeal. Therefore, we point out that references to the record in the first appeal, identified by the trial court number 49D05–9406–MI–10588, will simply be Record at ___. References to the supplemental record are also the supplemental record of the first appeal. References to Record II are to the record of the second appeal, identified by the trial court number 48D01–9512–CP–0835.

3. The reader may also find it helpful to review *Prosser v. J.M Corp.* (1994) Ind.App., 629 N.E.2d 904, in which this court addressed a different issue which found its genesis in the same legal setting.

approval of a forty-seven-acre landfill. A public hearing was held on the application. Several geological problems with the site were raised. J.M. subsequently submitted an amended landfill construction and operating application for a thirteen-acre landfill.

The Board preliminarily issued a construction permit to J.M. on March 22, 1984, and the Intervenors filed objections. On March 24, 1986, Administrative Law Judge Garretson (the ALJ) issued an order recommending that the Board approve J.M.'s preliminary construction permit with several amendments. The Board, on September 23, 1986, adopted the ALJ's recommended order and recommended amendments, and J.M. was issued the construction permit.

At the time the Board approved J.M.'s construction permit, 330 IAC 4–5–6 (1984 Ed.) required that, as a requirement for the approval of an operating permit for a landfill, "[i]n no case shall solid waste be deposited in an aquifer. A barrier of undisturbed soil shall be maintained between the lowest portion of deposited refuse and the aquifer of a thickness to be determined by the Board." This is the "aquifer rule". An aquifer, in turn, is defined as a "porous water-bearing geological formation, such as sand, gravel, sandstone and fractured or cavernous limestone, from which water can be drawn by wells in useable quantities." 330 IAC 4–2–1.

330 IAC 4 et seq. (The Refuse Disposal Act) required that landfill proposals submit to a two-stage permit process—construction and operation.[4] During the first stage, the petitioner must apply for a construction permit at least sixty days before the proposed construction date and submit various information about the landfill's proposed plans. In turn, the Board reviews the materials and "make[s] a determination of the acceptability of the site and proposed operation with regard to protection of the public health and environment." 330 IAC 4–3–5.

During the second stage, the petitioner applies for an operating permit at least sixty days before the proposed operation of the landfill. Included within the section regarding an operating permit are numerous requirements which the landfill must meet. Among those is the aforementioned aquifer rule.

### A. The Aquifer Rule

■ The essence of the first appeal is that the Board had before it in April of 1994 ample evidence to conclude, as it did, that the landfill violated the aquifer rule. When examining whether J.M. had violated the aquifer rule, the Board approached the question in two parts. As noted above, the aquifer rule first states that solid waste shall not be placed in an aquifer, and then it states that a barrier of undisturbed soil should exist between the waste and the aquifer. In addressing the rule as a two-part test, the Board found that interconnection exists between the "upper sands" and the "lower aquifer" and that there was "no Required Barrier of 'Undisturbed Soil' ". Record at 39–40[5]. (Appx. at 1–5,7) However, it appears to this court that the aquifer simply requires one inquiry. If there is a barrier of undisturbed soil *between* the refuse and the aquifer, then, as a matter of logic, refuse is not deposited *within* the aquifer. The only question the Board needed to answer is whether there was an adequate barrier as required by the aquifer rule.

Again, the aquifer rule required a "barrier of undisturbed soil ... between the lowest portion of deposited refuse and the aquifer of a thickness to be determined by the Board." 330 IAC 4–5–6. In addressing the issue, the April 1994 Board concluded that "the fact that J.M.'s operating permit requires compacted clay to be added to obtain a twelve foot barrier demonstrates that the natural barrier of undisturbed soil present at the site is insufficient." Record at 37–40 (Appx.1–7).

---

4. However, the construction and operating permit applications could be submitted at the same time. 330 IAC 4–5–2 (1984 Ed.).

5. This portion of the Record represents the Board's 1994 order which is reproduced in the Appellant's Appendix. However, page seven of the order is missing from the record yet reproduced in the appendix. Neither party raises this minor error; therefore, we will consider page seven of the order, reproduced in the appendix, as a part of the record.

What the Board fails to address is the fact that, in its construction permit, J.M. was *required* to add compacted soil to areas so there was a twelve foot barrier above sand and gravel for the entire landfill. The condition set forth in the construction permit read:

> "In areas with less than 12 feet of interface thickness above sand and gravel, either the area must be excavated, the sand and gravel removed and then backfilled with compacted clay material, or additional compacted clay material must be added at the surface to maintain the minimum 12 feet of interface thickness." Record at 1487.

The trial court, recognizing that the Board, in one instance, required twelve feet with compacted clay and, in the other instance, denied the permit based upon the presence of compacted clay, pointed to 330 IAC 4–3–5. As previously mentioned, that section declares that the Board, at the construction permit stage, "shall make a determination of the site and proposed operation with regard to protection of the public health and environment." The trial court therefore determined that the 1986 decision of the Board with regard to the construction permit, which was not appealed, was a conclusive resolution of the geological issues which the Board may not again revisit.

■ While we hesitate to say that the Board may not revisit the geological issues at all, we agree with the trial court that the Board may not now impose different geological requirements than those which it required at the construction phase. The interaction of section five and the aquifer rule demonstrates that the Board at the construction permit stage made an assessment of the thickness of the barrier that would be necessary for the landfill. That determination was that a barrier of twelve feet, consisting of undisturbed soil and compacted clay, between the deposited refuse and the sand and gravel was sufficient to preclude waste from finding its way into the aquifer. The Board, upon its consideration of the operating permit was foreclosed from establishing new criteria.

■ The Intervenors and the Board impliedly assert that the determination, at the construction permit phase, that the necessary barrier should be twelve feet including compacted clay, is erroneous. The rule does state that the barrier shall be "of undisturbed soil" and "of a thickness to be determined by the Board." 330 IAC 4–5–6. The construction permit required the barrier be twelve feet, but allowed it to be comprised, at least in part, of compacted clay. However, no appeal was taken from that determination. Therefore, the issue of whether it was error to allow the barrier to be comprised of compacted clay is waived and not properly before the Board upon remand.

■ The only determination that the April 1994 Board needed to make regarding the aquifer rule was whether there existed a twelve foot barrier, consisting of both compacted clay and undisturbed soil, between the "lowest portion of deposited refuse" and the aquifer. The Board did not make this determination. Therefore, this issue must be remanded to the Board in order to make a determination as to whether the aquifer rule requirements as set forth in the construction permit have been met [6].

## B. The Trial Court's Clarification Order

The second issue in the first appeal revolves around Indiana's financial responsibility law, formerly I.C. 13–7–22–2 (Burns Code Ed. Supp.1990). After Judge Coachys issued the order from whence the aquifer rule issue arose, the Board, upon remand, began examining J.M.'s compliance with the above statute. J.M. requested that Judge Coachys issue an immediate clarification of his June 22 order. He did so, as follows:

> "1. The only remaining issue regarding J.M.'s compliance with Ind.Code § 13–7–22–2 is whether there is any material difference between J.M.'s financial statement

---

**6.** The Board's order is also unclear as to whether the interconnection of the sand lenses of which it speaks reaches up and through the "barrier". If the sand lenses do permeate the twelve foot area, then the Board would be entitled to conclude that it is not a "barrier" as required by the construction permit.

for its fiscal year 1993 compared to its financial statement for its fiscal year 1995. 2. If there is no material difference, then J.M. has demonstrated that it complies with Ind.Code § 13–7–22–2 in all respects." Supplemental Record at 355.

The court further ordered the OEA to complete all administrative action upon J.M.'s permit within fifteen days.

The financial responsibility law has been intertwined with J.M.'s operating permit application since the statute's enactment on March 20, 1990. As we noted in *Prosser v. J.M. Corp.* (1994) Ind.App., 629 N.E.2d 904, J.M. was informed that it would be issued an operating permit if it complied with the statute requiring it to demonstrate a net worth of at least $250,000 by submitting a financial statement for the year preceding the issuance of the permit. IDEM contended that 1987 was the appropriate year because the permit had been "issued," but a petition for review had effectively stayed that issue. In *Prosser*, we determined that the statute required J.M. to provide a financial statement for the year immediately preceding the year the permit was to actually be issued, i.e. the year in which J.M. would begin operation. *Id.* at 908.

Upon remand, the viability of J.M.'s March 31, 1993 [7] financial statement was disputed. Judge Ryan of the Marion County Circuit Court conducted an evidentiary hearing to determine whether the financial statement met with the statute's requirements, and he issued an order on March 11, 1994. At the time of Judge Ryan's order, the statute required that a financial statement must meet the following requirements:

"(1) The statement must have been prepared in accordance with generally accepted accounting principles.

(2) The statement must have been audited by an independent certified public accountant.

(3) The accountant referred to in subdivision (2) must have issued an unqualified opinion as to the statement.

(4) The statement must indicate that, at the end of the calendar year or fiscal year immediately preceding the year in which the permit would be issued, the applicant had a positive net worth of at least two hundred fifty thousand dollars ($250,000)." I.C. 13–7–22–2 (Burns Code Ed. Supp. 1990).

The statute also specifically pointed out that it applied to permit applications which were filed before the effective date of the act, but either were not yet granted or were granted and awaiting a pending appeal. Judge Ryan concluded that J.M.'s 1993 financial statement fully complied with the requirements of the statute and remanded to the Board.

However, J.M.'s fiscal year ended on March 31, 1994; therefore, pursuant to our decision in *Prosser, supra,* 629 N.E.2d at 904, J.M.'s March 1993 financial statement was no longer relevant. The dispositive financial statement was that of March 1994. As a result, Judge Ryan issued the following order:

"1. This Court's Orders of March 11, 1994 and March 14, 1994 are, as a practical matter, moot.

2. For this reason only, the Court hereby vacates its Orders of March 11, 1994 and March 14, 1994." Supplemental Record at 122.

The cause again went before the Board. The Board, perhaps wary that a denial upon grounds that J.M. did not comply with the requirements of the financial responsibility statute would be overturned by the trial court, denied the permit on the basis of the geological issues hereinbefore discussed. That denial was reversed by Special Judge Coachys of the Marion Superior Court. Although that issue has already been addressed, when Judge Coachys made his June 22, 1995 order, he ordered the Board (or its successor) to "complete all administrative action on J.M.'s operating permit application within sixty (60) days." He further "retain[ed] continuing jurisdiction over [the] matter to insure the Parties' compliance" with his order. Record at 2744.

---

7. J.M.'s fiscal year ended March 31.

After Judge Coachys' order, the OEA determined, on September 20, 1995, that J.M. failed to meet the requirements of the financial responsibility statute. This prompted Judge Coachys to issue the aforementioned clarification order on November 6, 1995 which is, in part, the subject of this appeal.

■ IDEM and the Intervenors maintain that Judge Coachys' order was in error because it required the OEA to merely compare the 1995 financial statement with the 1993 statement which Judge Ryan had declared sufficiently met the requirements of the statute. However, as the appellants point out, Judge Ryan had vacated his order because of mootness. As he indicated in his order, the only reason that Judge Ryan vacated his own order was because of the passage of time. It no longer mattered whether the 1993 financial statement fulfilled the requirements of the statute; the 1994 statement was now the relevant financial statement. However, we are compelled to agree with the appellants. Judge Ryan's order was vacated and it no longer had any precedential weight. Requiring the OEA to base its approval of the 1995 statement upon a previously vacated decision that the 1993 statement was sufficient deprives the appellants of the right to appeal the validity of the 1993 decision.

■ Ordinarily, we might conclude that the appropriate course for this present court is to remand to the OEA in order to determine whether J.M.'s *current* statement complies with I.C. 13–7–22–2. Alas, although the parties do not raise the issue, I.C. 13–7–22–2 has been repealed and replaced with a similar statute found at I.C. 13–22–9–1 (Burns Code Ed. Repl.1996); *See* P.L. 1–1996, §§ 12, 99. The new statute places different requirements upon a person applying for an operating license. However, a careful examination of the new statute reveals that it applies to "a person that applies for a permit." *Id.* The new statute says nothing about pending applications or pending appeals. While we may apply this statute to a party awaiting approval upon an operating permit application, we do not find that it applies to J.M. which had an operating permit *approved* in 1988. *Prosser, supra*, 629

N.E.2d at 906. We also acknowledge that requiring J.M. to show that its most current financial statement complies with the former statute seems futile. Therefore, we determine that J.M. need only show that its 1995 financial statement complied with the former statute (I.C.13–7–22–2).

Pursuant to Judge Coachys' clarification order, the OEA conducted a final hearing on November 21, 1995. The OEA issued a final order on November 29, 1995 approving J.M.'s permit. As the OEA recognized in this order, the sole issue regarding the financial responsibility law was whether the 1995 statement was materially different from the 1993 statement. The OEA determined that it was not.

While we have said that an appropriate action for the OEA was to make an independent review of the 1995 statement and not simply compare the 1995 and 1993 financial statements, we note that the OEA determined that the 1995 statement, without reference to material differences between it and the 1993 statement, fulfilled the requirements of the financial responsibility statute. Rather than simply concluding that the 1993 and 1995 statements were materially identical, the OEA determined that "J.M. has demonstrated that it meets the requirements of the Financial Responsibility Law thus ensuring that (the) landfill operator(s) has a certain financial stability to be able to maintain and operate a landfill responsibly." Record II at 23.

At the heart of the debate as to whether J.M. had satisfied the requirements of the financial responsibility statute is the effect upon J.M.'s net worth of a refinancing-restructuring agreement intended to release J.M. from obligations to its former creditors by assigning J.M.'s debts. This same concern was addressed in J.M.'s 1993 financial statement and the OEA acknowledged that, insofar as it was listed in the 1995 statement, it did not constitute a material difference between the two statements. However, the OEA, in the November 29, 1995 order, independently addressed the effect of the agreement. The OEA, analyzing the evidence presented to it at the hearing, noted that IDEM's conclusion that J.M. was contingent-

ly liable for the debts of its shareholders was legally incorrect. The OEA also concluded that the evidence showed that J.M. assigned its debts in exchange for a full release from those debts, and J.M. had not endorsed any notes that would give rise to any contingent liability on the part of the corporation. Therefore, at the November 1995 hearing, the OEA addressed all of the issues pertinent to the resolution of whether J.M. has fulfilled the requirements of the financial responsibility statute. The question of whether Judge Coachys' clarification order was erroneous is of no moment.

## II. THE SECOND APPEAL

From the OEA order of November 1995, the Intervenors and IDEM separately petitioned for judicial review. J.M. moved to dismiss the petitions for judicial review because, pursuant to the requirements of the Administrative Orders and Procedures Act (AOPA), IDEM had failed to verify specific facts and the Intervenors' petition was not served upon the individual statutorily designated as the ultimate authority for the challenged action. Such is necessary to vest the reviewing court with jurisdiction. The court, by Judge Ronald Gottsschalk, granted J.M.'s motion with regard to IDEM's petition; however, the court denied J.M.'s motion to dismiss the Intervenors' petition based upon the incorrect service. On July 3, 1996, IDEM filed an amended petition for judicial review with the necessary verified facts, after the time for filing a petition pursuant to AOPA had passed. IDEM argued that its amended petition related back to its original petition by virtue of Trial Rule 15(A). The court allowed IDEM to proceed as a party. The court then granted summary judgment in favor of the Intervenors.

J.M. contends in the second appeal that the reviewing court erred by not granting its motion to dismiss and allowing the Intervenors to proceed with its petition for judicial review when they had not complied with all of the jurisdictional requirements of AOPA. J.M. also argues that the court erred in

allowing IDEM's amended petition to relate back to its original petition. *See Hoosier Environmental Council v. Department of Natural Resources* (1996) Ind.App., 673 N.E.2d 811, *reh'g denied.* However, because we reverse the decision of the reviewing court, we need not address J.M.'s jurisdictional arguments.

The court granted summary judgment in favor of IDEM and the Intervenors, vacated the November 29, 1995 order of the OEA and remanded the cause to the OEA. J.M. appeals the judgment of the trial court. The trial court granted summary judgment based upon its decision that the OEA applied the incorrect standard in evaluating J.M.'s compliance with the financial responsibility statute, the operating permit was void because of IDEM's failure to hold a public hearing pursuant to I.C. 13–7–10–2(b), and the Intervenors were entitled to reopen the permit inquiry and obtain judicial review because the permit was modified to include a leachate collection system. Because IDEM and the Intervenors both petitioned for review based upon the former issue and only the Intervenors petitioned for review on the latter two issues, we address them in that order.[8]

### A. Compliance With the Financial Responsibility Statute

In its summary judgment, the reviewing court, by Judge Gottschalk, determined that the OEA used the incorrect standard in evaluating J.M.'s compliance with I.C. 13–7–22–2. Using varying degrees of emphasis, the trial court concluded that "the OEA did *NOT* make **any** determination of whether J.M.'s fiscal year financial statement complies with the *substantive* net worth requirements contained in the statute." Record II at 1193. The court determined that the "material difference" standard required by Judge Coachys' clarification order was in error, thus the OEA's determination was also in error.

As we have discussed, Judge Gottschalk was correct in indicating that Judge Coachys' clarification order was in error; however, the fact that the clarification order was in error

**8.** In essence, IDEM takes no position in its brief as to whether the Intervenors were entitled to a

second hearing as discussed infra, Part III B.

is not necessarily fatal to the OEA's order. Contrary to the reviewing court's conclusions, the OEA did make a determination that the financial statement met the requirements of the statute. Thus, the trial court's summary judgment must be reversed and the determination of the OEA that J.M. fulfilled the requirements of the financial responsibility law be reinstated.

*B. Other Issues*

█ In order to address the trial court's conclusion that the Intervenors were entitled to a public hearing pursuant to I.C. 13–7–10–2(b), yet more procedural history is necessary. When J.M. submitted its second construction permit application for a forty-seven-acre landfill in 1982, a public hearing was held.[9] Several problems surfaced at the hearing which resulted in a major redesign of the proposed, now thirteen-acre, landfill. As previously mentioned, the Board granted J.M. the construction permit, adopting the ALJ's proposed amendments, on September 23, 1986. On November 30, 1987, a petition was filed for a public hearing on J.M.'s operating permit.

The petition was filed pursuant to I.C. 13–7–10–2(b) which read:

"(b) A public hearing shall be held on the question of the issuance of an original or renewal permit for a hazardous waste disposal facility ... or on the question of the issuance of an original permit for a solid waste disposal facility."[10]

Even though no public hearing was held on the permit application, a preliminary operating permit was issued by IDEM on December 12, 1988.

The Intervenors filed objections to the operating permit, and the prolific litigation which is the subject of this appeal ensued. Among the errors alleged by the Intervenors was that IDEM was required to hold a second public hearing on J.M.'s *operating* permit. ALJ Garrettson addressed Intervenors' concerns in his November 10, 1989 recommended order. He noted specifically that the failure of IDEM to hold a second public hearing was not in violation of I.C. 13–7–10–2. He also, pursuant to the requests of the Intervenors, ordered that J.M. submit plans and construct, a leachate collection system, subject to IDEM's approval.[11]

The Intervenors appealed the ALJ's order asserting, inter alia, that a second public hearing was required by the statute and that 329 IAC § 2–8–11(a) stands for the proposition that the Intervenors had the right to judicial review because J.M.'s operating permit required a leachate collection system, which is a modification of the conditions of the permit.

Before the Board had an opportunity to address the merits of the Intervenors' appeal, the financial responsibility statute was enacted, and the Board decided to remand the cause in order to allow the parties to address I.C. 13–7–22–2. It is from this remand that *Prosser, supra,* 629 N.E.2d at 904, arose. Finally, after the financial issues were fully examined, the Board again turned its attention to the Intervenors' objections. In its May 31, 1994 order, the Board voted to deny J.M.'s operating permit; however, it did so by concluding that J.M.'s proposed permit violated the aquifer rule as earlier discussed. The Board specifically pointed out that:

"Because the Board finds that the Mallard Lake site is geologically unsuitable for the operation of a landfill and because J.M.'s operating permit is denied on the grounds referenced in this Order, the Board does not choose to address, and need not address, the Intervenors' three remaining objections to the issuance of J.M.'s operating permit." Record II at 1182.

Again, the Board did not address the ALJ's contentions that the Intervenors were not entitled to an additional hearing.

The Board's May 1994 order was subject of judicial review and was vacated by Judge Coachys in his June 22 order. When peti-

---

**9.** The public hearing was held upon J.M.'s request. J.M. actually requested a public hearing for its "construction/operating permit". Record II at 1035.

**10.** The current provision is found at I.C. 13–15–3–3 (Burns Code Ed. Repl.1996).

**11.** Leachate is a noxious substance created by rain sifting through the landfill.

tioning for judicial review, J.M. only sought review of those issues relating to the aquifer rule. Judge Coachys' order only addressed those geological issues, and according to Judge Gottschalk (the order from which the present appeal is taken), Judge Coachys' order left to be decided whether the Intervenors were entitled to a second hearing, a hearing on the leachate collection system and whether J.M. complied with the financial responsibility law. As we have previously pointed out, J.M. petitioned Judge Coachys for a clarification order which limited the review of the financial responsibility statute. When the, now, OEA finally rendered its decision, it addressed all of the issues and incorporated ALJ Garrettson's 1989 recommended order, which declared that the Intervenors were not entitled to a second hearing and that a leachate collection system was to be constructed.

### 1. The Leachate Collection System

ALJ Garrettson's 1989 recommended order contained the following:

> "That prior to operation, Applicant shall submit plans for, and upon approval of IDEM, construct, a leachate collection system pursuant to 329 IAC 1.5." Record at 1505.

The Intervenors point to 329 IAC 2–8–11(a) which states that:

> "When a permit is modified, only the conditions subject to modification are reopened and subject to review pursuant to I.C. 13–7–10–5 and I.C. 4–21.5–3–7."

According to the Intervenors, when the OEA adopted the ALJ's recommended order in 1995, it included the modification which must be reopened and subject to review. The Intervenors are mistaken.

In order to obtain review under I.C. 13–7–10–5 or I.C. 4–21.5–3–7, the Intervenors must be aggrieved by the modification. However, the Intervenors acknowledge that the regulations applicable to J.M.'s operating permit did not require a leachate collection system. The requirement was added as a modification to the operating permit *at their urging*. The Intervenors further argue that

such a system would "help prevent contamination." Record at 1375. Intervenors are estopped from asserting that modification of the permit to include a leachate collection system, a modification that they fully endorsed, makes them aggrieved parties. The Intervenors have no right to obtain review.

### 2. A Second Public Hearing

■ As abovementioned, Intervenors collected enough signatures to petition for a public hearing upon J.M.'s *operating* permit. They assert that they have a right to a hearing on both the construction permit and the operating permit. ALJ Garrettson and the OEA, however, found that the Intervenors had no right to a second public hearing. As mentioned above, a public hearing shall be held on the question of the issuance of an "original" permit for a solid waste disposal facility. I.C. 13–7–10–2.

J.M. points out that it requested a hearing for its "application for construction/operating permit", and a hearing was held in April of 1983. Record at 1034. ALJ Garrettson's order, which was adopted by the OEA, made the following findings:

> "1. On November 30, 1987, a Petition for [second] Public Hearing was filed with IDEM.
> 2. At the initial public hearing held in April 1983, public comments were received regarding both the construction and operation of Mallard Lake Landfill.
> 3. A second public hearing was not held." Record at 1502

The order also concluded that the failure to hold the public hearing as requested by the Intervenors was not a violation of the statute.

The reviewing court, in vacating the OEA's order, concluded that a public hearing was held in April 1983 on J.M.'s construction application. This is not a conclusion of law; it is a finding of fact. We, however, are reminded that the trial court is bound by the agency's findings of fact. *Moore, supra,* 682 N.E.2d at 545. As the OEA properly found, there was a hearing in April 1983 on both the issues of J.M.'s construction and operating permits.[12]

---

12. J.M. asserts that, since the statute only requires a hearing on the issuance of an *original*

permit for the facility, a hearing is only warranted for the construction permit application. Be-

The Intervenors next contend that J.M. withdrew its application and completely redesigned its landfill subsequent to the public hearing. Therefore, the Intervenors, assert that a new hearing was required for the new landfill design. While the trial court agreed with the Intervenors that J.M. "withdrew" its application (Record II at 1189), in ALJ Garrettson's order approving the construction permit—adopted by the Board—and the Board's 1994 order denying J.M.'s operating permit, the Board determined that J.M. "amended" its permit application. Again, the reviewing court erred in making this finding of fact.

Because the permit applications were amended, a public hearing had still been held upon the issuance of the *original* permit application. In fact, the public hearing is the vehicle by which Intervenors may prompt amendment of such permit applications. Although the Intervenors may have been able to seek, and indeed obtained, review of the various amendments, such review has come to an end. The OEA was correct in determining that another public hearing was not required.

## CONCLUSION

As Judge Coachys correctly determined in the first appeal, the operating permit phase was not a forum for the Board or the OEA to revisit the geological standards which it had developed in the construction permit phase. During the operating permit phase, the duty of the OEA was to evaluate whether J.M. complied with the standards which the agency previously established. J.M. was required to establish a barrier of twelve feet between any refuse and the aquifer or any sand zone. The barrier was to be of both compacted clay and undisturbed soil. The only thing that the OEA need now address is whether J.M. has established such a barrier.

The OEA correctly determined that J.M. has complied with the financial responsibility statute and further action on that issue is foreclosed. Further, the Intervenors have no right to another public hearing on the permit process nor do they possess a right to review of the issues surrounding the leachate collection system.

Judge Gottschalk's order of December 13, 1996 is hereby reversed and the decision of the OEA of November 29, 1995 is hereby reinstated.

Judge Coachys' order of June 22, 1995 is affirmed insofar as it vacates the decision of the Board and reversed insofar as it concludes that the landfill does not violate the aquifer rule.

This cause is hereby remanded to the OEA to make one determination consistent with this opinion, i.e. whether the landfill has a barrier of twelve feet comprised of both compacted clay and undisturbed soil. The OEA shall complete such a determination and either approve or deny J.M.'s operating permit within thirty days from the date of this opinion.

FRIEDLANDER and HOFFMAN, JJ., concur.

---

cause the OEA found that a hearing was held which encompassed the issuance of both permits, we need not resolve this question. We note that

the current process contemplates a one-step process and does not bifurcate the construction and operating permit phases.